**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**John Burton MOODY, Defendant-
Appellant.**

**No. 16862.**

United States Court of Appeals
Sixth Circuit.

Jan. 27, 1967.

Lucius E. Burch, Jr., Memphis, Tenn., for appellant, Tom Mitchell, Jr., Memphis, Tenn., on the brief, Burch, Porter & Johnson, Farris, Hancock & Mitchell, Memphis, Tenn., of counsel.

Odell Horton, Jr., Asst. U. S. Atty., Memphis, Tenn., for appellee, Thomas L. Robinson, U. S. Atty., Memphis, Tenn., Mitchell Rogovin, Asst. Atty. Gen., Joseph M. Howard, Atty., Tax Div., Dept. of Justice, Washington, D. C., on the brief.

Before EDWARDS and CELEBREZ-ZE, Circuit Judges, and KALB-FLEISCH,* District Judge.

EDWARDS, Circuit Judge.

Appellant has twice been tried and convicted before a jury in the United States District Court for the Western District of Tennessee on a four-count indictment charging willful evasion of federal income taxes in violation of the Internal Revenue Code of 1954, § 7201. On appeal to this court, the previous conviction was reversed. United States v. Moody, 339 F.2d 161 (C.A.6, 1964). This court held that defendant had been denied the right to introduce evidence

* Honorable Girard E. Kalbfleisch, United States District Judge for the Northern District of Ohio, sitting by designation.

pertaining to, and had been denied an instruction on, his claim that he owed no additional taxes for the disputed years.

On retrial and reconviction defendant was again sentenced to five-year concurrent sentences on each of the four counts. On this appeal defendant complains of many aspects of the judge's charge to the jury. He also claims prejudicial error in several comments to the jury made by government counsel during closing arguments. And he likewise complains of the admission of hearsay evidence at the second trial by dint of cross-examination of a defense witness pertaining to what had happened at the first trial.

Defendant is a medical doctor in private practice in Dyersburg, Tennessee. The indictment alleged (and proofs showed!) that defendant filed a tax return for the year 1956, showing $2,584.90 taxable income, and no federal income tax due; for the year 1957, showing taxable income of $3,639.64, and tax due of $53; for the year 1958, showing taxable income of $2,019.80, and tax due of $403.96; and for the year 1959, showing taxable income of $2,119.06, and tax due of $423.81. The indictments also charged that defendant knew his taxable income and tax due in those same years was 1956—$6,503.73 and $1,350.82; 1957 —$5,079.42 and $1,037.47; 1958— $8,576.59 and $1,829.91; and 1959— $13,633.39 and $3,210.02.

As we have noted, the jury at this second trial found defendant guilty on all four counts. No issue pertaining to the sufficiency of the evidence to uphold this verdict is presented to us. But it seems essential to us in dealing with the legal and procedural problems which are advanced to note both the essential nature of the evidence from the prosecution and the essential nature of the defense.

The chief prosecution witness, a special agent with the Intelligence Division, Internal Revenue Service, made an analysis of the checking account operated during these four years by defendant. After adding the known items paid by defend-

ant in cash during those years and deducting all deposits which were of a non-income nature, he arrived at the total taxable income for each year previously noted in the indictment. These proofs showed $33,793.13 of taxable income for the four years in question, whereas defendant's returns for those years showed a total of $10,363.40. As far as we are able to deduce, these totals are not in dispute in this appeal—nor apparently were they at the end of the trial.

Secondly, the prosecution produced witnesses who testified to the amounts actually paid defendant by them for medical services and introduced the canceled checks for such services. Thus the prosecution demonstrated that in 132 instances (totaling $5,023.70) either these amounts were entirely omitted or were entered on the defendant's books (from which his tax returns were made up) in very much smaller sums. All of these items were based upon microfilms of canceled checks upon out-of-town banks which the government subpoenaed from the Dyersburg State Bank. But the proofs showed that the Dyersburg State Bank did not keep or make microfilms of local checks.

The defense did not seek to establish the accuracy of the defendant's returns. Basically it contended before the jury, first, that as to the 132 items referred to above, their omission or inaccurate recordation was due to errors of the doctor's bookkeeper. The bookkeeper (defendant's mother-in-law) testified that during the years in question defendant saw 25 to 30 patients daily and that she could have made sufficient errors to account for the $5,000 discrepancy. It was clearly established, however, that the defendant received the fees and made all bank deposits and simply told the bookkeeper of the amount to enter. Defendant did not testify.

The second and principal defense was that because of various deductions (to which it was argued the doctor was entitled) and certain claimed loans during the period in question, the defendant actually owed the government no tax for

the years in question. These claimed deductions and loans were over and above any similar items shown on the defendant's tax return and had not been referred to in those returns. If allowed in total, they would have served to offset the government claim of $6,547.45 tax due.

Of course, we must read the jury verdict as resolving such factual disputes as were presented to it in favor of the government; and as we have noted, defendant submits no appellate issue as to weight or sufficiency of the evidence.

■ On appeal the argument before this court was begun by appellant's counsel with the frank statement that defendant was an abortionist and that, hence, this court should take great care to see that his procedural rights in this tax evasion case were properly observed —presumably because of the prejudicial effect that the source of his income might have had upon the judge or jury. The fact that income is procured by means which are illegal under state law does not, of course, constitute evidence of violation of federal tax statutes. Lurding v. United States, 179 F.2d 419 (C.A. 6, 1950). But, equally obviously, it does not create any immunity from them either.

■ As to appellant's issues 4 through 12, based upon the judge's charge as given, or on his failure to give defendant's requests to charge, we find no reversible error. We have reviewed the charge in toto and considered each of defendant's detailed complaints about it. The trial judge was clearly under no obligation to give his instructions in language chosen by one of the contending parties. We believe those matters covered by defendant's request to charge, which should have been made part of the charge, were adequately and fairly set forth to the jury in the charge as given. The charge was full, informative, accurate and balanced and contained in our judgment no error which served to prejudice defendant's case.

Appellant's principal reliance at oral argument was on his first two stated issues, which pertained to two claimed loans from one Eddie Adkins to defendant. At this trial defendant's counsel, without calling Adkins, cross-examined the principal witness for the prosecution on Adkins' previous testimony at the first trial. Over the government's objection, he read into the record an affidavit by Adkins stating that in 1958 he loaned Dr. Moody $5,000 and in 1959 he loaned Dr. Moody $4,000, and that Dr. Moody repaid approximately $1,000 and still owed Adkins $8,000.[1]

With defendant's counsel still cross-examining, there followed this colloquy:

"Q. Now, you know that Adkins had asserted that he was a crap-shooter and had brought that money back from Burma from gambling in the Army in a money belt?

"Had—

"A. The reason I wanted to hesitate, I thought there was something stated a few minutes ago that I could not testify that Mr. Adkins or anybody else had testified.

"That is all conclusion—

"Mr. McTighe: We have no objection.

"Q. You have hesitated, now, to go ahead and answer. But your lawyers are telling me it can be done, the lead can be done.

"Now, go ahead, answer.

"A. Yes, sir. I didn't want to get in trouble with the Court on hearsay evidence. But, to answer your question, Mr. Adkins did testify that he did come back from overseas with this money strapped around his waist, and that he didn't let his wife know he had it, and carried it around the country, either around his waist or would stick it in the back of the car,

1. We note, of course, appellant's claim of error in the admission of the affidavit when offered by the government. This occurred, however, after appellant's counsel had already read the entire affidavit into the record from a copy and secured agreement from the principal government witness that he had seen same.

or something, and that, although he was borrowing, he did not let his wife know that he had this money, and that Dr. Moody was a good friend of his, and he loaned it without charging him any interest.

"Q. Well, now, in inquiring as to whether he received that money, did you inquire into his Army record, and find out from anybody that had served with him whether really he was a big gambler on the Lido Road as he had indicated?

"A. No, sir. I did not."

Subsequently defendant's principal witness, an ex-Revenue Agent, testified to a computation of defendant's income which accepted the Adkins' loans as non-taxable funds available to defendant in two of the years in dispute. Thereupon counsel for the government cross-examined him extensively seeking to establish the implausibility of Adkins' story. Much of this cross-examination clearly tended to show investigation by revenue agents of the "Adkins lead" because it consisted of documentary proofs of numerous loans and time payment arrangements entered into by Adkins or his wife during a period when he claimed to have $13,000 to $14,000 cash in his possession. Government counsel also cross-examined defendant's principal witness by asking him about his knowledge of Adkins' handling of his claimed Burma Road bonanza. In this cross-examination counsel for the government frequently sought to read Adkins' testimony at the previous trial (at which the witness had been present) in order to show that the witness knew that Adkins had claimed 1) to have brought the $13,000–$14,000 home from the Burma Road in cash carried in a money belt; 2) to have continued (apparently most of the time) to carry same in a money belt for the subsequent 20 years; 3) to have (at different times) buried the cash in his backyard and kept it in a wall safe in his G.I. loan financed house, all without his wife knowing anything about his having the money. This procedure of cross-examination was per-

mitted by the trial judge over defendant's counsel's objection on the theory that the reading of the record served to "refresh the recollection" of the witness.

On appeal appellant claims that the trial judge should have granted his request to instruct the jury to allow the Adkins loans because of the government's failure to run down the Adkins lead by investigating military records and seeking possible witnesses to Adkins' Burma Road gambling winnings.

In this regard appellant relies upon Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954), where the court said:

"When the Government rests its case solely on the approximations and circumstantial inferences of a net worth computation, the cogency of its proof depends upon its effective negation of reasonable explanations by the taxpayer inconsistent with guilt. Such refutation might fail when the Government does not track down relevant leads furnished by the taxpayer— *leads reasonably susceptible of being checked,* which, if true, would establish the taxpayer's innocence. When the Government fails to show an investigation into the validity of such leads, the trial judge may consider them as true and the Government's case insufficient to go to the jury. This should aid in forestalling unjust prosecutions, and have the practical advantage of eliminating the dilemma, especially serious in this type of case, of the accused's being forced by the risk of an adverse verdict to come forward to substantiate leads which he had previously furnished the Government. It is a procedure entirely consistent with the position long espoused by the Government that its duty is not to convict but to see that justice is done." (Emphasis added.) Holland v. United States, supra at 135–136, 75 S.Ct. at 135.

It seems clear to us, however, that the revenue agents met the requirements of this paragraph when the underlined language is taken into account. The de-

tailed investigation of Mr. and Mrs. Adkins' financial affairs in the period immediately preceding the claimed loans of 1958 and 1959 is much more relevant to the validity of the "lead" than a check of a 20-year-old gambling bonanza. This record seems to us to demonstrate a reasonable effort to run down the Adkins lead. Buttermore v. United States, 180 F.2d 853 (C.A.6, 1950).

■ Appellant also claims reversible error in admission of the hearsay evidence just referred to concerning Adkins' first trial testimony. As to this issue appellant's counsel elected not to call Adkins but sought and was granted permission over appellee's objection to introduce Adkins' affidavit. Then counsel for appellant developed (this time without objection) other hearsay from Adkins' testimony at the earlier trial. Appellee claims, of course, that its subsequent cross-examination which developed still more of Adkins' previous trial testimony was only a fair balancing of the advantage which the earlier hearsay had given appellant.

Under the circumstances we have outlined, we have no doubt that some "curative admissibility" was in order. See 1 Wigmore, Evidence § 15 (3d ed. 1940). With the door opened this widely in favor of appellant, we cannot say that the District Judge's rulings in favor of appellee's proffered hearsay on the same subject was an abuse of judicial discretion or constituted reversible error. Crawford v. United States, 91 U.S.App. D.C. 234, 198 F.2d 976 (1952).

Lastly, appellant contends that the United States District Attorney's closing argument contained several improper remarks which constituted prejudicial error and entitled appellant to still another trial.

Appellant's counsel did not interpose objections when the remarks were made and subsequently declined (as a matter of trial tactics) the District Judge's offer to admonish the jury about them.

While all of the remarks objected to might better have been left unmade, only one might approach prejudice requiring a new trial. In summation the Assistant District Attorney said:

"And I have tried—and the United States Attorney's office has tried in this case to do what we consider to be our duty, to point out to you—to show you these things and say to you that we feel in the light of all this proof that this is one of the worst fraud cases—maybe not in amount because we can't prove everything we may think or feel or believe—but this is one of the worst fraud cases ever been here in this court, based on this type of testimony that has been attempted to use to explain it."

■ Counsel plainly is not entitled to argue or cite facts or evidence which are not part of the record. Rommel-McFerran Co. v. Local 369, International Bhd. of Electrical Workers, AFL-CIO, 361 F.2d 658, 661 (C.A.6, 1966).

■ But in this case appellees proved substantial unreported and unexplained income. The reference could have been to the fact (established by the record) that the Dyersburg State Bank's failure to keep local checks had prevented identification of the sources of some of this income.

Whether this is so or not, we do not believe that this was a close case (United States v. Rayborn, 310 F.2d 339 (C.A.6, 1962)), or on this total record that the comment amounts to error so prejudicial that this defendant was deprived of a fair trial. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940).

■ We, of course, do not have before us the probation report which was available to the United States District Judge prior to sentence to ascertain whether or not a prior felony record justified the administration of the maximum concurrent sentences of imprisonment in this case. Absent such a record, it appears to us that sentences totaling less than half of the sentence actually imposed would satisfy the federal interest in the violation of its tax laws detailed herein.

In United States v. West Coast News, this court said:

"Upon a mandate going down on the affirmance of the conviction of these defendants, it will be within the power of the District Judge under Rule 35 of the Federal Rules of Criminal Procedure to reduce the prison sentences imposed. He can do this *sua sponte* without command from us or motion by defendants. Because of this, we need not now announce whether we consider that the District Judge abused his discretion in imposing the involved sentences, whether we consider that today's law permits us to change such sentences, or whether we consider that the sentences imposed by the District Judge offend the Eighth Amendment proscription of cruel and inhuman punishment. There will be time enough for us to further consider the matter should the District Judge conclude not to adopt our suggestion as to reduction of the sentences." United States v. West Coast News Company, 357 F.2d 855, 865 (C.A.6, 1966).

We affirm this conviction and remand the case to the District Court for its reconsideration of the prison sentences in the light of this opinion.